# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| ELIZABETH BERGSTROM, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 2:17-00039** |
| | ) | **Chief Judge Crenshaw/Brown** |
| NANCY A. BERRYHILL, ACTING | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY,[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

**To: The Honorable Waverly D. Crenshaw, Jr., Chief United States District Judge.**

## REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration (SSA) through its Commissioner denying plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 416(I) and 423(d). For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 11) be **DENIED** and the Commissioner's decision **AFFIRMED**.

## I. PROCEDURAL HISTORY[2]

Plaintiff filed an application for DIB on February 13, 2013. Plaintiff alleged that she was disabled because of degenerative disc disease and fibromyalgia (fibromyalgia or FM). (Doc. 5, pp. 115, 122, 251) Plaintiff alleged an amended disability onset date of June 3, 2013. Plaintiff's

---

[1]  Acting Commissioner Berryhill is properly substituted for the "Social Security Administration" as the defendant to this action. *See* Fed. R. Civ. P. 25(d) and 42 U.S.C. § 405(g).

[2]  The procedural history below is adopted from the Jurisdiction and Procedural History section of the Administrative Law Judge's (ALJ) May 9, 2016 decision (Doc. 5, p. 22) unless otherwise indicated. References to page numbers in the administrative record are to the numbers that appear in bold in the lower right corner of each page.

application was denied initially on November 7, 2013 and upon reconsideration on March 20, 2014.

Plaintiff requested a hearing before an ALJ on April 10, 2014. A hearing was held before ALJ Todd Spangler on April 4, 2016. Plaintiff was represented at the hearing by attorney Donna Simpson. Edward Smith, an independent vocational expert (VE) testified at the hearing.

The ALJ entered an unfavorable decision on May 9, 2016. (Doc. 5, pp. 19-37) Plaintiff appealed the decision to the Appeals Council on May 27, 2016 (Doc. 5, p. 187) which denied her request for review on May 11, 2017 (Doc. 5, pp. 1-7).

Plaintiff brought this action through counsel on July 13, 2017 (Doc. 1), following which she filed a motion for judgment on the administrative record on December 4, 2017 (Doc. 11). The Commissioner responded in opposition on January 2, 2018. (Doc. 13) Plaintiff did not reply. This matter is now properly before the court.

## II. EVIDENCE[3]

### A. Documentary Evidence

### 1. Medical Evidence

The medical records for Dr. Alan Drake, M.D., are before the court for the period March 21, 2001 through February 29, 2016.[4] (Doc. 5, pp. 333-66, 384-98, 432-41, 474-80, 585-91) The following letter written by Dr. Drake to the White County Board of Education on May 23, 2013 is among these records:

---

[3] The medical evidence of record (MER), non-medical documentary evidence, and testimony at the hearing are discussed below to the extent necessary to address plaintiff's claims of error. The remainder of the evidence is incorporated herein by reference.

[4] The records for the period March 21, 2001 to August 11, 2008 are billing summaries. (Doc. 5, pp. 333-44) There is no clinical evidence in these records. The records for the period November 8, 2010 to May 22, 2013 contain a fax transmittal sheet, a summary of "problems" for the period, lists of medications and allergies, basic vitals, questions pertaining to personal habits, prevention questions, past medical history, and a list of medications no longer taken. (Doc. 5, pp. 345-47) There is no clinical evidence in these records either.

> Ms. Bergstrom suffers from fibromyalgia, chronic back pain, multiple allergies, and a disorder that makes it impossible for her to work with the chemicals involved in her work as a janitorial worker at . . . Woodland Park [Elementary School (hereinafter Woodland Park)]. The fact that air conditioning will be turned off in the near future also complicates her functional picture.
>
> This is to notify you that she will be taking a medical leave due to the above listed problems beginning June 6, 2013. I anticipate that she probably will not return in the near future [due] to the nature of her problems.

(Doc. 5, p. 361) Also among these records is a letter written by Dr. Drake on April 2, 2014 after plaintiff's application for benefits was denied on initial review:

> It is my understanding, from Ms. Bergstrom, that she has been denied disability benefits due to a recent decision.
>
> I am her primary care provider and have been for many years. [Plaintiff] suffers from significant fibromyalgia, degenerative disc disease, depression, and anxiety. **It is my opinion that she is unable to obtain and keep gainful employment with her lack of formal education and training/experience.** <u>She is unable to work on a continuous basis for more than a few minutes without experiencing significant symptoms and thus is unable to maintain gainful employment.</u> I would urge you to please reconsider your decision.

(Doc. 5, p. 393)(bold and underline added to support the analysis below at pp. 10-18)

Dr. Drake referred plaintiff to Dr. Khan W. Li, M.D., in September 2008 for a neurological evaluation of her low back pain. (Doc. 5, pp. 382-83) Dr. Li wrote the following in his September 29, 2008 report: "[Plaintiff] has full strength in both of her extremities. The sensation is intact to light touch. Gait is within normal limits. Balance is normal. Reflexes are 1+ and symmetric." (Doc. 5, p. 382) Dr. Li also wrote:

> [Plaintiff] brings today with her an MRI of her lumbar spine. This MRI demonstrates extensive degenerative disc disease from L3-4 to L4-5, including L5-S1. There are significant . . . changes to the

vertebral bodies. There is an element of foraminal stenosis[5] bilaterally at L4-5, which is moderate, and some mild central stenosis at L4-5 and L3-4. Overall, [plaintiff's ] MRI demonstrates significant degenerative disease for someone her age.

(Doc. 5, p. 382) Dr. Li also noted that he thought plaintiff "could benefit from physical therapy," that she "may . . . in her lifetime require some sort of spinal surgery," "that since she is able to deal with the pain so well right now, and is able to work full-time . . . she is not yet at the point of requiring surgery," and that she "is content with coping with her pain with her pain medicines and her normal daily routines." (Doc. 5, pp. 382-83)

Dr. Jeffrey Loveland, D.P.M., treated plaintiff for foot problems seven times between November 19, 2009 and August 31, 2015. (Doc. 5, pp. 452-73) Dr. Loveland noted the following on three occasions between June 15 and August 31, 2015: "Patient denies any past joint pain, joint swelling, muscle pain, post static dyskinesia,[6] weakness, back pain or joint disability." (Doc. 5, pp. 453, 456, 461)

Plaintiff presented to Dr. W. Travis Cain, M.D., on March 26, 2013 to assess an alleged "reaction to metal in [her] caps and dental work." (Doc. 5, pp. 444-48) Dr. Cain noted in the examination section of his clinical record that plaintiff was "in no acute distress," and in both the Review of Systems (ROS) and examination sections that she exhibited "[n]o specific joint pains, joint swelling, or erythema[7] around the joints." (Doc. 5, pp. 444-45) Dr. Cain noted subsequently that tests for allergies to dental metals, latex and mouse feces were negative. (Doc. 5, p. 446)

---

5   Foramen – "a natural opening or passage, especially one into or through a bone." *Dorland's Illustrated Medical Dictionary* 729 (32 ed. 2012). Stenosis – "an abnormal narrowing of a duct or canal . . . ." *Dorland's* at p. 1769.

6   Dyskinesia – "distortion or impairment of voluntary movement, as in a tic . . . [or] . . . spasm . . . ." *Dorland's* at p. 578.

7   Erythema – "redness of the skin produced by congestion of the capillaries." *Dorland's* at p. 643.

Dr. Terrence Leveck, M.D., examined plaintiff consultively on September 26, 2013. (Doc. 5, pp. 368-71) Dr. Leveck noted that plaintiff was in "no acute distress" at the time of her exam, that she "move[d] readily between the chair and the table," and that "[s]trength testing [wa]s normal in her grips, elbows, wrists, ankles, and knees." (Doc. 5, p. 369) Dr. Leveck referred plaintiff for X-rays of her "lumbosacral spine" because the results of the 2008 MRI were "not available to [him]." (Doc. 5, p. 368) The impressions from the X-rays were as follows: "Tiny dextroscoliosis[8] curvature, multiple mildly narrowed degenerative lumbar discs and associated minimal hypertrophic[9] endplate lipping[10]." (Doc. 5, p. 371) Dr. Leveck diagnosed plaintiff with "Musculoskeletal back pain" and FM, noting that her "[f]ibromyalgia examination revealed tenderness at 14 of 18 points." (Doc. 5, 370) His assessment of plaintiff's physical capabilities was as follows: "She could sit for eight hours out of eight. Fine motor function is intact. She can stand and walk for eight hours out of eight and lift and carry 5 lbs occasionally." (Doc. 5, p. 370)

B. Kathryn Galbraith, Ph.D., examined plaintiff consultively on September 30, 2013 to conduct a clinical interview, mental status examination, and to review the record.[11] (Doc. 5, pp. 372-77) Dr. Galbraith diagnosed plaintiff with "[a]djustment [d]isorder [w]ith [a]nxiety" noting that her

---

[8] Dextroscoliosis – ". . . . a combining form denoting relationship to the right . . . ." *Dorland's* at p. 505. Scoliosis – "an appreciable lateral deviation in the normally straight vertical line of the spine." *Dorland's* at p. 1601.

[9] Hypertrophy – "the enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells. . . ." *Dorland's* at 898.

[10] Lipping – "the development of a bony overgrowth in osteoarthritis." *Dorland's* at 1065.

[11] The record shows that Dr. Galbraith reviewed the following records in connection with her consultive examination: 1) the Adult Function Report dated July 7, 2013 (Doc. 5, pp. 271-78); 2) the Application Summary For Disability Benefits (Doc. 5, pp.189-92), the Work Activity Report (Doc. 5, pp. 209-20), the Report of SGA Determination (Doc. 5, pp. 221-24), and the Disability Report – Field Office (Doc. 5, pp. 225-27), all dated March 1, 2013; 3) Dr. Drake's clinical records from November 8, 2010 to August 21, 2013 (Doc. 5, pp. 345-66); 4) the Work History Report and Function Report – Adult (Doc. 5, pp. 261-84). (Doc. 5, p. 373) Plaintiff "was the sole informant for the interview" otherwise. (Doc. 5, p. 373)

"current psychiatric state was euthymic,"[12] and characterizing her psychiatric impairments as "mild" to "moderate." (Doc. 5 p. 377)  Plaintiff represented that she was able to "prepare simple meals . . . wash dishes, vacuum, sweep and do laundry though she ha[d] to take frequent rest periods," but was "unable to do yard work." (Doc. 5, p. 376)  Plaintiff also represented during the course of her evaluation that "she ha[d] never been fired or let go" from a job. (Doc. 5, p. 376)

Rebecca Joslin, Ed.D., examined the MER on October 3, 2013 on initial review. (Doc. 5 pp. 81-82)  Dr. Joslin determined that plaintiff had an anxiety disorder that resulted in only mild to moderate limitations. (Doc. 5, p. 82)

Dr. Charles Settle, M.D., examined the MER on November 6, 2013 on initial review. (Doc. 5, pp. 84-86)  Dr. Settle determined that plaintiff had the residual functional capacity (RFC) to perform light work with limitations.

On December 11, 2013, plaintiff requested that her 2008 MRIs be repeated because they were "over five years old and . . . w[ould] not be accepted by the disability people . . . ." (Doc. 5, p. 385)  Dr. Drake ordered MRIs of plaintiff's lumbar and cervical spine. (Doc. 5, p. 386)  The MRIs were completed on December 20, 2013. (Doc. 5, pp. 561-62)  On December 23, 2013, Dr. Drake's office "notified [plaintiff] there were no changes from the last MRI per Dr. Drake," *i.e.*, the MRI that she provided to Dr. Li in 2008. (Doc. 5, p. 386)

M. Duncan Currey, Ph.D., examined the MER on March 12, 2014 upon reconsideration. (Doc. 5, pp. 99-100)  Dr. Currey also determined that plaintiff had an anxiety disorder that resulted only in mild to moderate limitations. (Doc. 5, p. 99)

Dr. Frank Pennington, M.D., examined the MER on March 19, 2014 upon reconsideration. (Doc. 5, pp. 101-04)  Dr. Pennington also determined that plaintiff could perform light work with

---

[12] Euthymia – "a state of mental tranquility and well-being, neither depressed nor manic." *Dorland's* at . 655.

limitations.

Dr. R. Craig Saunders, M.D., examined plaintiff for left ankle pain on September 9 and October 7, 2014. (Doc. 5, pp. 400-08) Dr. Saunders wrote the following in the ROS section of both clinical reports: "Patient reports . . . no muscle aches, no muscle weakness . . . no back pain . . . no exercise intolerance . . . no arm pain on exertion . . . no weakness, no numbness . . . no fatigue . . . ." (Doc. 5, pp. 402, 406)

## 2. Non-Medical Documentary Evidence

Sandra Crouch, Director of Schools in White County, provided a written testimonial dated March 31, 2014 in which she stated, in relevant part, that plaintiff "resigned from the school system in 2012[13] due to her continued battle with her illness. . . ." (Doc. 5, p. 311)

Will England, an English Teacher at Woodland Park, provided an undated written testimonial which included the following:

> Liz continued to be part of Woodland Park until the fall of 2013 when she resigned. The last year . . . Liz . . . would come in late, leave early, or not come in at all. When she was [on the job] she complained about being tired and hurting and could not do certain jobs. This caused conflicts between her and her co-workers. . . .

(Doc. 5, pp. 312-13)

Craig Lynn, the principal at Woodland Park from 2008-2012, provided a written testimonial dated April 2, 2014 which included the following:

> . . . . During my last two years as principal [plaintiff] began having health issues that hindered her performance. [She] complained to me about muscle pains and aches and chronic fatigue problems. . . . She . . . got where she could not lift the trash cans in the dumpster due to pain. Also during this time, her character began to change . . . . Again during my last two years, especially during the last year, her mood swung from mild depression to being combative with staff. My

---

[13]  The record shows that plaintiff actually left her position in 2013.

last year at the school, she became difficult to work with because of arguing and could not get along with the other custodians. . . .

(Doc. 5, p. 315)

Kim Luna, Principal of Woodland Park beginning in 2010 provided a written testimonial dated April 3, 2014 that included the following:

> . . . . During the four years we worked together she would have difficulty getting to work on time or even finishing a complete day. [She] complained of fibromyalgia symptoms that caused her not to be able to complete her work as assigned. We even changed her work shift to accommodate for her medical symptoms. This change . . . did not improve her ability to complete her assignments. [She] was not able to be patient with faculty, staff, and students. She was also allergic to latex, rat feces, and wax. This caused her to rely on others to complete some of her assigned duties.

(Doc. 5, p. 314)

Michael J. Bergstrom and Michael A. Bruce, plaintiff's husband and son respectively, each submitted written statements. (Doc. 5, pp. 326-29) Both supported the symptoms and limiting effects alleged by plaintiff.

### B. Administrative Hearing

Plaintiff testified upon questioning by the ALJ that she could lift "[n]othing heavier than a gallon of milk, eight pounds, seven pounds." (Doc. 5, p. 54) Plaintiff also testified that "dry heaves" caused her to be late for work (Doc. 5, pp. 45-46), that her dry heaves were controlled through medication in 2009 or 2010 (Doc. 5, pp. 50-51), and that she no longer had dry heaves (Doc. 5, p. 50). When confronted with the disparity between her testimony that dry heaves caused her to be late for work as recently as June 2013, and her admission that they were controlled through medication as early in 2009 or 2010, plaintiff changed her testimony stating that "it's now more IBS than throwing up. It's more diarrhea than . . . . the other." (Doc. 5, p. 52) Plaintiff testified further that she had surgery on her feet in July 2015, that her foot problems made it difficult to walk and

caused her toes to become numb, that "a lot of times" she was unable to feel her feet, but that she had not been back to see the doctor. (Doc. 5, pp. 52-53, 56) Plaintiff testified that the numbness in her feet was intermittent, but occurred whether standing or sitting. (Doc. 5, pp. 55-56)

Plaintiff testified upon questioning by counsel that her feet were numb "[a]ll the time." (Doc. 5, p. 66) Plaintiff also testified upon questioning by counsel that a rheumatologist diagnosed her with FM in 2009 and "turned it over to [her] primary care doctor," Dr. Drake, who actually treated her, that the rheumatologist's name was "Dr. James Baker," and that Dr. Baker had moved to East Tennessee. (Doc. 5, pp. 50, 58) Plaintiff also testified that she was allergic to latex. (Doc. 5, p. 62)

Counsel cross-examined the VE as follows with respect to the his testimony in response to the ALJ's hypotheticals:

> Q    If you assumed under the first or second hypothetical in addition to having to alternate sitting and standing she had to alternate with the sitting and standing either being in a recliner with her feet elevated or lying down, if you threw that into the mix would she be able to perform the jobs you described.
>
> A    No.
>
> Q    If you assume that her pain is such that it would interfere with her ability to concentrate on task as much as 15 to 20% of the day, would she . . . be able to perform the jobs you described.
>
> A.   No.

(Doc. 5, p. 71) Counsel did not ask the VE any other questions. (Doc. 5, p. 71)

## III.  ANALYSIS

### A.  The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if she can show her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process to determine whether an individual is "disabled" within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374-75 (6th Cir. 2014). While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's RFC and vocational profile. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374. Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2003). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence supports a different conclusion. *Gayheart*, 710 F.3d at 374.

## B. Claims of Error

### 1. Whether the ALJ Erred in Giving No Weight to Dr. Drake's Opinion (Doc. 12, pp. 10-11)

Plaintiff alleges that the ALJ erred in giving "no weight" to that part of Dr. Drake's opinion underlined above at p. 3, *i.e.*, "She is unable to work on a continuous basis for more than a few minutes without experiencing significant symptoms and thus is unable to maintain gainful employment" (hereinafter Dr. Drake's opinion). Plaintiff asserts that:

. . . . The ALJ rejected this entire opinion because 'the conclusion about work Ms. Bergstrom can do is an administrative decision reserved to the commissioner.' **The ALJ failed to consider the restriction given by Dr. Drake that Ms. Bergstrom is unable to work on a continuous basis for more than a few minutes**.

(Doc. 12, ¶ II.A, p. 10)(bold added to support the analysis that follows)  The part of the ALJ's

decision to which this claim of error pertains is quoted below in its entirety:

> The Administrative Law Judge gives no weight to the April 2, 2014 opinion of <u>treating physician Alan Drake, MD</u>, as he opined the claimant was unable to maintain gainful employment due to her lack of formal education and training/experience (Exhibit 10F). The undersigned finds this opinion appears focused only toward her current job as a custodian; and he is not in a position to know the type of jobs available to an individual with her education and training.  The undersigned finds this is an administrative issue reserved to the Commissioner.

(Doc. 5, p. 30)(underline added to support the analysis that follows)  Plaintiff asserts the following

specific arguments in support of her first claim of error:

> Dr. Drake has had a long term relationship with his patient.  Billing records of Dr. Drake show that he was treating [plaintiff] as early as 2001.  He has noted her fibromyalgia and degenerative disc disease on multiple occasions.  Dr. Drake referred [plaintiff] to Dr. Khan Li, a neurosurgeon, for evaluation of her back condition.  Dr. Drake's assessment is consistent with the medical evidence and with [plaintiff's] hearing testimony. . . .

(Doc. 12, p. 11)(internal references to the record omitted)[14]

As shown by the underlined text above, the ALJ acknowledged that Dr. Drake was plaintiff's

treating physician.[15]  Under the standard commonly called the "treating physician rule," the ALJ is

---

[14]  The ALJ's treatment of the portion of Dr. Drake's letter in bold above at p. 3 is not at issue.

[15]  Plaintiff asserts that, "[a]lthough controlling weight to the opinion is not appropriate" with respect to Dr. Drake's opinion, "no weight to the opinion is also not appropriate."  (Doc. 12, p. 11)  It is unclear what plaintiff means by this statement.  Therefore, the undersigned will address the ALJ's treatment of Dr. Drake's opinion in the context of the treating physician rule.

required to give a treating source's opinion "controlling weight" if two conditions are met: 1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques," and 2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.1527(c)(2)). The ALJ "is not bound by a treating physician's opinions, especially when there is substantial medical evidence to the contrary." *Cutlip v. Sec'y of Health and Human Serv's*, 25 F.3d 284, 287 (6th Cir. 1994). In that instance, the ALJ is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting SSR 96–2p, 1996 WL 374188 at *5 (SSA)).

A plain reading of the ALJ's decision quoted on the preceding page reveals that he did not address Dr. Drake's opinion. Nevertheless, a violation of the treating physician rule is harmless if: 1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; 2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or 3) where the Commissioner has met the goal of 20 C.F.R. § 1527(d)(2) even though he has not complied with the terms of the regulation. *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011)(citations omitted). As shown below, Dr. Drake's opinion is so "patently deficient" that the Commissioner could not possibly have credited it.

Turning first to Dr. Drake's opinion itself, his statement that plaintiff "is unable to work on a continuous basis for more than a few minutes without experiencing significant symptoms" is conclusory because he makes no effort whatsoever to explain why plaintiff's conditions, *i.e.*, FM,

degenerative disc disease, depression, and anxiety, affect her ability to work. The law is firmly established in the Sixth Circuit that an ALJ is not bound by a physician's conclusory statements in Social Security cases. *See Austin v. Comm'r of Soc. Sec.*, 714 Fed.Appx. 569, 573 (6th Cir. 2018); *Burton v. Comm'r of Soc. Sec.*, 690 Fed.Appx. 398, 401 (6th Cir. 2017); *Ellars v. Comm'r of Soc. Sec.*, 647 Fed.Appx. 563, 566 (6th Cir. 2016); *Coldiron v. Comm's of Soc. Sec.*, 391 Fed.Appx. 435, 441 (6th Cir. 2010); *White v. Comm's of Soc. Sec.*, 572 F.3d 272, 286 (6th Cir. 2009); *Germany-Johnson v. Comm. of Soc. Sec.*, 313 Fed.Appx. 771, 780 (6th Cir. 2008); *West v. Comm'r of Soc. Sec.*, 240 Fed.Appx. 692, 696 (6th Cir. 2007); *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 509 (6th Cir. 2006); *Pasco v. Comm'r of Soc. Sec.*, 137 Fed.Appx. 828, 837 (6th Cir. 2005); *Carreon v. Massanari*, 51 Fed.Appx. 571, 574 (6th Cir. 2002); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Cohen v. Sec'y of Health and Human Servs*, 964 F.2d 524, 528 (6th Cir. 1992); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). More particularly, "[a] treating doctor's disability determination must be fully supported by direct reference to detailed, clinical, diagnostic evidence in the medical reports.*" Carter v. Comm'r of Soc. Sec.*, 36 Fed.Appx. 190, 191 (6th Cir. 2002)(citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997)). Although the conclusory nature of Dr. Drake's opinion is sufficient in itself to satisfy the "patently deficient" standard, the undersigned will address plaintiff's FM, degenerative disc disease, depression, and anxiety separately for the sake of completeness.

Turning first to plaintiff's FM, of the sixteen actual clinical records before the court[16] attributable to Dr. Drake, Dr. Drake diagnosed plaintiff with "MYALGIA AND MYOSITIS[17]

---

[16] There actually are eighteen relevant clinical records attributable to Dr. Drake in the MER. However, two of them are not considered here because they pertain to telephonic requests for prescription refills. (Doc. 5, pp. 436-37)

[17] Myositis – "inflammation of a voluntary muscle . . . ." *Dorland's* at p. 1225 (italics in the original).

NOS[18]" in thirteen of them between June 22, 2012 and September 2, 2015 (Doc. 5, pp. 352, 354, 356, 358, 360, 364, 386, 388, 392, 432, 435, 475, 477), "Fibromyalgia" on November 30, 2015 and February 29, 2016 (Doc. 5, pp. 586-91), and on September 8, 2014 he made no mention of either condition (Doc. 5, p. 389-90).[19] Of the fifteen relevant clinical records, the ROS and "Exam" sections in ten of them are normal in all respects, *i.e.*, there are no concerns expressed about muscle pain or weakness, swollen or sore joints, *etc.* in the ROS sections, and the Exam sections do not mention anything related to FM. (Doc. 5, pp. 351-54, 359-60, 385-88, 434-35, 474-77, 586-91). In the three clinical records dated August 24 and November 2, 2012, and February 25, 2015, Dr. Drake referred without elaboration in the musculoskeletal section of the ROS to plaintiff's subjective representations in the history of present illness (HPI) section, *i.e.*, "SEE HPI," "see above,"and "see above" respectively. (Doc. 5, pp. 355, 357, 433) However, apart from the following vague representations in the HPI sections, *i.e.*, plaintiff "presents with a FMA . . . flare up," plaintiff "presents with persistent muscle . . . pain," plaintiff "continues to struggle with fibromyalgia symptomatology which has not changed significantly" (Doc. 5, pp. 355, 357, 432), there is nothing in the HPI or the associated "Exam" sections in these clinical records that supports Dr. Drake's opinion (Doc. 5, pp. 356, 358, 433). On August 21, 2013, Dr. Drake did note "multiple problems" in the musculoskeletal part of the ROS section of the record and, in the "Exam" section he wrote that "musculoskeletal exam shows diffuse tenderness to palpation and limited range of motion [ROM] to a moderate degree." (Doc. 5, pp 363-64) A year later, on August 25, 2014 after noting "[n]o concerns about muscle pain or weakness, swollen or sore joints" in the ROS section, Dr. Drake wrote in the "Exam" section that plaintiff had "diffuse tenderness to palpation of musculature of the

---

[18] NOS – not otherwise specified.

[19] The following discussion assumes without deciding that there is no difference between "MYALGIA AND MYOSITIS NOS" and fibromyalgia, and that both are considered FM under the regulations.

extremities, and trunk. There are several trigger points present as well." (Doc. 5, pp. 391-92) Overlooking the obvious internal inconsistency in the August 25, 2014 clinical record, both of these clinical records lack sufficient specificity even under the relaxed evidentiary standards applicable to FM. More particularly, Dr. Drake did not specify the location and severity of the tenderness noted or specific ranges of motion and joints evaluated in the first instance, or the location and severity of the tenderness noted and the number and location of the trigger points reported in the second instance. A diagnosis of FM does not "automatically entitle" plaintiff to disability benefits. *See Vance v. Comm's of Soc. Sec.*, 260 Fed.Appx. 801, 806 (6th Cir. 2008).

There also is no other medical evidence in the record that supports Dr. Drake's opinion. As noted above at p. 9, plaintiff testified that rheumatologist Dr. James Baker diagnosed her with FM in 2009, that Dr. Baker had moved to East Tennessee, and that Dr. Drake treated her pursuant to Dr. Baker's diagnosis. Dr. Baker's name cannot be found in any of Dr. Drake's clinical records either in the form of an order referral or reference to any report or diagnosis of FM attributable to him. In short, apart from plaintiff's request in December 2013 for "whatever information" Dr. Drake might have pertaining to Dr. Baker, Dr. Drake's clinical records are silent as to Dr. Baker.[20] Additionally, there is nothing in the clinical records attributable to Drs. Li, Loveland, Cain, Galbraith, Leveck, Settle, Pennington, or Saunders, discussed above at pp. 3-7, that supports Dr. Drake's opinion in the context of FM. Dr. Li's report pertained to the health of plaintiff's spine. Dr. Loveland treated plaintiff for foot problems. Dr. Cain treated plaintiff for an alleged reaction to metal used in her dental work. Dr. Leveck's determination that plaintiff could sit, stand, and walk

---

[20] A quick search of the internet shows that rheumatologist Dr. James Baker established a rheumatology practice in Johnson City, Tennessee in late 2011, and that he "previously owned a rheumatology practice in Sparta, Tennessee." *See http://sofha.net/clinics/medical-specialists-of-johnson-city*. Dr. Drake's clinical records show that his practice was in Sparta, Tennessee in 2009 when Dr. Baker was practicing there. In short, plaintiff could have obtained Dr. Baker's clinical records had she wanted to, and it was her burden to do so, but she did not.

for 8 hrs. in an 8-hour workday is contrary to Dr. Drake's opinion that plaintiff could not work on a continuous basis for the more than a few minutes, as are the reports of Drs. Settle and Pennington who determined that plaintiff was capable performing light work. Finally, Dr. Saunders' who treated plaintiff for ankle pain observed that plaintiff did not report muscle aches or weakness, exercise intolerance, arm pain on exertion, no weakness or numbness, and no fatigue.

Turning next to plaintiff's degenerative disc disease, Dr. Drake's opinion once again is not supported by the record. The record shows that, although Dr. Drake diagnosed plaintiff with "BACKACHE NOS" on May 22 and December 11, 2013 (Doc. 5, pp. 351-52, 385-86), and noted in the most general of terms on several different occasions in the HPI section of his report that plaintiff had back problems (Doc. 5, pp. 351, 353, 355, 365, 385, 397), he never diagnosed plaintiff with degenerative disc disease. As for the two occasions Dr. Drake diagnosed plaintiff with "BACKACHE NOS," the ROS or "Exam" sections of those two clinical records are devoid of any observations or findings that would support those diagnoses. The ROS and "Exam" sections in the remainder of Dr. Blake's records discussed above at pp. 13-15 also are silent with respect to any observations or findings that would support Dr. Blake's opinion in the context of degenerative disc disease. There also is no other evidence in the record that supports Dr. Drake's opinion. As discussed above at pp. 3-4, although Dr. Li observed that plaintiff had numerous significant spinal defects "for someone her age," Dr. Li also reported that plaintiff was "able to . . . work full time" with her condition and, according to the record, she did so for 4 yrs. 8-plus mos. afterward. In short, Dr. Li's report of plaintiff's back condition in 2008 when she was working full time does not support Dr. Drake's opinion that the identical back condition, confirmed by the December 2013 MRIs discussed above at p. 6, was somehow disabling 5½ years later. The X-Rays of plaintiff's back ordered by Dr. Leveck in September 2013, discussed above at p. 5, also do not support Dr. Drake's

16

opinion inasmuch as the impressions of those images characterize plaintiff's back condition using such terms as "tiny," "mildly," and "minimal."

Finally, Dr. Drake's opinion in the context of "depression and anxiety" is not supported by the record. More particularly, Dr. Drake noted the following in ROS section of each and every one of his clinical notes from June 22, 2012 to February 29, 2016: "No concerns about excessive anxiety, emotion liability, or depression." (Doc. 5, pp. 351, 353, 355, 357, 359, 364, 386-87, 389, 391, 433, 435, 474, 477, 587, 590) In each of those same clinical records, Dr. Drake also noted that plaintiff was in "no apparent distress," and that her "mood and affect [were] normal." (Doc. 5, pp. 352, 354, 356, 358, 360, 364, 386, 388, 389, 392, 433, 435, 474, 477, 587, 590) Although Dr. Drake did assess plaintiff with depression on November 2, 2012 (Doc. 5, p. 356) and anxiety on May 22, 2013 (Doc. 5, p. 352), these two assessments are not entitled to any weight for the following reasons: 1) they are inconsistent with the representations in Dr. Drake's clinical records noted in the preceding two sentences (Doc. 5, pp. 351-52, 357-58); 2) Dr. Drake is not a psychiatrist or psychologist;[21] 3) the record is devoid of any clinical or laboratory data provided by professionals trained to make observations and diagnoses in those fields; 4) the two clinical reports attributable to Dr. Drake 6 mos. apart do not establish that plaintiff's alleged mental impairment had lasted or could be expected to last at least 12 mos., nor is there anything in his clinical records from which it might be construed that the 12-month requirement was met; 5) the two clinical reports attributable to Dr. Drake predate the amended disability onset date and, therefore, are not relevant to the period of disability at issue. Here too, there also is no other evidence in the record that supports Dr. Drake's opinion in the context of depression and anxiety. Apart from the opinions of Drs. Galbraith, Joslin, and Currey, all of whom determined that plaintiff's psychiatric impairments were mild to moderate, the record

---

[21] The undersigned notes that Dr. Drake is a certified family practice physician in Sparta, Tennessee. *See* alandrakemd.com.

is devoid of any other evidence from which an alternative conclusion might be reached.

As shown above, Dr. Drake's opinion that plaintiff "is unable to work on a continuous basis for more than a few minutes without experiencing significant symptoms" is so patently deficient that the Commissioner could not possibly have credited it. Consequently, the ALJ's failure to address Dr. Drake's opinion constitutes harmless error, and plaintiff's first claim for relief should be denied.

### 2. Whether the ALJ Erred in the Weight He Gave to Dr. Leveck's Opinion (Doc. 12, p. 12)

Plaintiff argues in her second claim of error that the ALJ gave insufficient reasons for discounting Dr. Leveck's opinion that plaintiff could lift only 5 lbs. "apparently" because she testified at the hearing that "she could lift two (2) pounds more than the five (5) pounds found appropriate by Dr. Leveck . . . [but] . . . that a restriction of twenty (20) pounds . . . was more appropriate" in the ALJ's view. (Doc. 12, p. 12) At issue here is Dr. Leveck's opinion that plaintiff could "lift and carry 5 lbs occasionally." (Doc. 5, p. 370)

The ALJ's determination as to Dr. Leveck's report is quoted below in its entirety for convenience of reference:

> The Administrative Law Judge gives some weight to the September 26, 2013 opinion of Mr. Leveck as **the lifting and carrying restrictions of five pounds occasionally are not consistent with the record as a whole. At her hearing, the claimant testified she was able to lift seven to eight pounds.** Dr. Leveck restricted the claimant to sitting for eight hours out of an eight-hour workday and standing/walking for eight hours out of an 8-hour workday. Out of an abundance of caution, the undersigned limited the claimant to sitting, walking, and standing for six hours each out of an 8-hour workday.

(Doc. 5, p. 29)(bold added to support the following analysis)

The law is well established that the ALJ is required to provide "good reasons" only for

discounting the weight given to a treating-source's opinion. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)); *see Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010)(citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)). Dr. Leveck was an examining non-treating source, not a treating source. Therefore, the ALJ was not required to give "good reasons" for discounting his opinion. *See Stacey v. Comm'r of Soc. Sec.*, 451 Fed.Appx. 517, 519 (6th Cir. 2011). Nevertheless, "the ALJ's decision still must say enough to allow the appellate court to trace the path of his reasoning." *Stacey*, 451 Fed.Appx. at 519.

As noted in bold on the preceding page, the ALJ discounted Dr. Leveck's 5 lb. lifting restriction for two reasons: 1) it was "not consistent with the record as a whole"; 2) plaintiff testified at the hearing that "she was able to lift seven to eight pounds." Turning to the first reason, there is nothing in Dr. Leveck's report, discussed above at p. 5, that supports a 5 lb. lifting restriction. Dr. Leveck makes no effort to explain how he determined the 5 lb. lifting restriction. Moreover, plaintiff demonstrated normal strength during Dr. Leveck's examination, and the X-Rays Dr. Leveck ordered of plaintiff's lumbar and thoracic spine, discussed above at p. 5, revealed mild defects at the worst. The remainder of the MER also does not support Dr. Leveck's 5 lb. lb. lifting restriction. As noted above at p. 4, plaintiff denied any weakness or back pain to Dr. Cain just six months before Dr. Leveck's examination. As noted above at pp. 5-6, Dr. Galbraith reported four days later that, apart from yard work, she was able to perform normal household chores. A little more than month after that on November 6, 2013, Dr. Settle determined that plaintiff had the RFC to perform light work,[22] and a little more than a month after that the repeat MRIs revealed that there were no changes from the 2008 MRIs when she still was working full time. As discussed above at pp. 6-7, Dr.

---

[22] Light work is defined as "lifting no more than 20 lbs at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567 § b. The ALJ determined in his RFC that plaintiff was "limited to lifting/carrying 20 lbs occasionally and 10 pounds frequent[ly] . . . ." (Doc. 5, p. 26)

Pennington also determined on March 19, 2014 that plaintiff could perform light work, and later that same year Dr. Saunders noted that plaintiff "report[ed] . . . no muscle weakness . . . no back pain . . . no exercise intolerance . . . no arm pain on exertion . . . [and] no weakness . . . ."

Turning to the second reason, and as shown above at p. 8, plaintiff did testify at the hearing that she could lift 7 to 8 lbs, as the ALJ wrote in his decision. However, 7 to 8 lbs. is not 5 lbs. Consequently, plaintiff's testimony did not support Dr. Leveck's opinion. Moreover, as explained in the preceding claims of error, plaintiff's testimony at the hearing was not supported by the MER.

The ALJ's decision pertaining to Dr. Leveck's 5 lb. lift restriction satisfies the standard for explaining the opinion of an examining non-treating source. His explanation is supported by the MER, and it is sufficient for the appellate courts to trace the path of his reasoning. Accordingly, plaintiff's second claim of error is without merit.

### 3. Whether the ALJ Erred in His Evaluation of Plaintiff's Credibility (Doc. 12, pp. 12-16)

Plaintiff provides the following arguments in support of her third claim of error that the ALJ erred in his credibility determination: 1) the ALJ's explanation of plaintiff credibility was not in accordance with SSR 96-7p; 2) the ALJ erred in determining that there was "no evidence of medical reports to support" plaintiff's 2012-2013 sick leave report; 3) the ALJ erred in placing "significance upon her coworkers not stating whether [plaintiff] voluntarily left her job"; 4) the ALJ erred in the reasons he gave for rejecting the statements from her coworkers. The ALJ wrote the following with respect to this claim of error:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not consistent with the medical evidence and other evidence for the

reasons explained in this decision.

(Doc. 5, pp. 30-31)

Credibility determinations regarding an applicant's subjective complaints such as those noted above rest with the ALJ and are afforded great weight and deference as long as they are supported by substantial evidence. *See Torres v. Comm'r of Soc. Sec.*, 490 Fed.Appx. 748, 755 (6th Cir. 2012). An ALJ's credibility assessment will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Indeed, the Sixth Circuit has "held that an administrative law judge's credibility findings are virtually 'unchallengeable.'" *Ritchie v. Comm'r of Soc. Sec.*, 540 Fed.Appx. 508, 511 (6th Cir. 2013)(quoting *Payne v. Comm'r of Soc. Sec.*, 402 Fed.Appx. 109, 112-13 (6th Cir. 2010)). Still, an ALJ's decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and any subsequent reviews the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 (SSA). Finally, "An ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)(quoting *Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 476 (6th Cir. 2003)).

### a. Compliance With SSR 96-7p

The ALJ is required to "explain his credibility determinations in his decision such that it 'must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec'y*, 486 F.3d 234, 248 (6th Cir. 2007)(quoting Social Security Ruling 96–7p, 1996 WL 374186, at *2 (SSA)). 20 C.F.R. § 404.1529 and SSR 96–7p describe a two-part process

for assessing the credibility of an individual's statements about symptoms. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; second, the ALJ must evaluate the intensity, persistence, and functional limitations of those symptoms by considering objective medical evidence and other evidence, including: 1) daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; 5) treatment, other than medication, received for relief of pain or other symptoms; 6) any measures used to relieve pain or other symptoms; and 7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR. 96–7p, 1996 WL 374186 at * 3 (SSA).

As shown at pp. 20-21, the paragraph in which the ALJ assessed plaintiff's credibility did not go into great detail regarding what he considered. However, the ALJ does assert that he considered "all of the evidence," "the entire record," or words to that effect, not less than fourteen (14) times in the decision. (Doc. 5, pp. 22, 24, 26-27, 29-31) In reviewing the decision, the ALJ also made specific reference to the following that go to the question of credibility: 1) plaintiff's testimony at the hearing that she had allergies was contradicted by the MER and the absence of any followup treatment (Doc. 5, ¶¶ 3, 5, pp. 24-25, 28); 2) plaintiff's activities of daily living (ADLs) "belie[d] her assertion that she [wa]s unable to perform normal daily work activities on a sustained basis" (Doc. 5, ¶ 4, p. 26); 3) plaintiff's testimony was inconsistent and contradictory with respect to the effect that dry heaves had on her ability to work (Doc. 5, ¶ 5, p. 27); 4) plaintiff's testimony was inconsistent and contradictory with respect to the alleged numbness in her feet (Doc. 5, ¶ 5, p. 27); 5) plaintiff failed to follow up with Dr. Loveland after he performed surgery on her foot (Doc.

5, p. 28); 6) X-Rays of plaintiff's spine in September 2013 were unremarkable (Doc. 5, ¶ 5, p. 28); 7) Dr. Li noted in 2008 that plaintiff "continued to work full-time using pain medication"despite the condition of her spine (Doc. 5, ¶ 5, p. 29); 8) plaintiff's testimony that she could lift only 7 to 8 lbs. *vis-a-vis* the opinions of Drs. Settle and Pennington that she was capable of performing light work with restrictions (Doc. 5, ¶ 5, pp. 29-30); 9) plaintiff's failure to seek treatment or therapy for her alleged psychological limitations (Doc. 5, p. 29).

Reading the decision as a whole, the ALJ's determination that plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." is sufficiently clear that plaintiff and any subsequent reviewers would understand his reasons. Therefore, the ALJ's credibility determination was consistent with SSR 96-7p.

### b. 2012-2013 Sick Leave Report

Plaintiff objects to the following statement made by the ALJ in his decision: "The claimant provided a 2012-2013 sick leave report; however, the Administrative Law Judge notes no evidence of medical reports to substantiate the 16 days of sick leave."[23] (Doc. 5, p. 27) Plaintiff argues only that "Dr. Drake wrote a letter to the White County Board of Education." (Doc. 12, p. 14)

The undersigned notes as an initial matter that Dr. Drake's letter is not a medical "report." It is merely a written notification that plaintiff would be taking medical leave effective June 16, 2013. The ALJ's determination that there was "no evidence or medical reports to substantiate the 16 days of sick leave" also is a correct reading of the record. The HPI section of the May 22, 2013 clinical record that gave rise to Dr. Drake's letter is quoted below:

47 Year Female presents with a request for a note to be off work.

---

[23] The sixteen days to which the ALJ refers fell within the period June 3 through 24, 2013, *i.e.*, 6 days during the period June 3-8, 2 days during the period June 11-12, and 8 days between the period June 13-24. (Doc. 5, p. 317)

> She has multiple issues due to chronic back pain/fibromyalgia, inability to handle chemical exposure [due to] multiple allergies, and the lack of air conditioning that will occur as school is now out of session. She is already in the process of trying to [] claim disability benefits and plans not to work again. She saw the allergist and is still in the process of being tested. . . .

(Doc. 5, p. 351) There is nothing in the clinical record containing the statement above that "substantiate[s] the 16 days of sick leave." In his next clinical record, dated August 21, 2013, Dr. Drake reported that plaintiff resigned on July 12, 2013. (Doc. 5, pp. 363-64) There is nothing in this later clinical record that "substantiate[s] the 16 days of sick leave," or elsewhere in Dr. Drake's clinical records, nor does plaintiff provide any references to the record to that end.

### c. Plaintiff's Coworkers

Plaintiff asserts here that: 1) the ALJ "erroneously relied" on whether plaintiff stopped working of own accord or was fired "to reject [plaintiff's] credibility" (Doc. 12, p. 15); 2) the ALJ "did not discuss [the] reasons for rejecting [her coworkers'] statements other than a general statement that he did not find them consistent with the record as a whole" (Doc. 12, p. 15); 3) the opinions of these lay witnesses were consistent with her testimony, "the reports of her treating doctors, Dr. Li and Dr. Drake, the report of the examining doctor, Dr. Leveck and the MRI, X-ray report and reports of trigger points of fibromyalgia." (Doc. 12, p. 16)

Turning to plaintiff's first argument, as noted above at pp. 20-21, the ALJ made no reference to whether plaintiff quit her job or was fired in the paragraph pertaining to his credibility determination. Rather, the credibility paragraph addresses only plaintiff's medically determined impairments, her alleged symptoms, and testimony as to intensity, persistence and limiting effects of those impairments and symptoms.

Notwithstanding the foregoing, the statement about with plaintiff complains does appear in the following paragraph:

> The Administrative Law Judge considered these testimonials; and he observes that **no one reported if the claimant ceased working on her own accord or if her supervisor discharged her**. It is noteworthy that the claimant reported to Dr. Galbraith that she had never been fired or let go from any jobs.

(Doc. 5, p. 30)(internal reference to the record omitted and bold added) As shown above at p. 7 in the discussion of Ms. Crouch and Mr. England's testimonials, the ALJ's statement that "no one reported if the claimant ceased working on her own accord or if her supervisor discharged her" is in error. That said, plaintiff does not allege nor can it be inferred from the pleadings how the issue of resigning versus being fired goes to the question of credibility, or how the results below would have been any different had the ALJ determined that plaintiff quit her job rather than being fired or *vice versa*. As there is no apparent nexus between the ALJ's error and the outcome of the proceedings below, the error is harmless. "[H]armless error analysis applies to credibility determinations in the social security disability context." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012).

As to plaintiff's second argument, opinions expressed by non-treating sources such as family members and coworkers are not entitled to any deference and the ALJ is not required to articulate good reasons for discounting their opinions. *See e.g., Smith*, 482 F.3d at 876. The ALJ is required only to consider their opinions and accord those opinions such weight as he deems appropriate. *See e.g., Engebrecht v. Comm'r of Soc. Sec.*, 572 Fed.Appx. 392, 397-98 (6th Cir. 2014). An opinion of a lay witness is "entitled to perceptible weight only if it is fully supported by the reports of the treating physicians." *Simons v. Comm'r of Soc. Sec.*, 114 Fed.Appx. 727, 733 (6th Cir. 2004)(citing *Lashley v. Sec'y of Health and Human Serv's*, 708 F.2d 1048, 1054 (6th Cir. 1983)). For the reasons explained in the preceding analyses, the MER does not support the opinions of the lay witnesses. Moreover, the record shows that the ALJ discounted the opinions of Ms. Crouch and Mr. England

because they were not qualified to address the issue of disability, the observations of Mr. Lynn and Ms. Luna because they were not supported by the MER, and the statements of plaintiff's husband and son because they likely were partial to plaintiff. (Doc. 5, p. 30) That was all the explanation the ALJ was required to provide.

The undersigned turns next to plaintiff's argument the reports of her "treating doctors, Dr. Li and Dr. Drake, the report of the examining doctor, Dr. Leveck and the MRI, X-ray report and reports of trigger points of fibromyalgia" were consistent with her testimony. As for Dr. Li's report, it was dated 4 years 9-plus months prior to plaintiff's amended disability onset date and, as such, it really is not relevant to the disability period at issue. In any event, since plaintiff still was working at the time, there was nothing in Dr. Li's report that would support plaintiff's testimony 7½ years later that she was unable to work. As discussed above at pp. 12-18, there is nothing in Dr. Drake's clinical records that would support plaintiff's testimony nor, as discussed above at pp. 19-20, is there anything in Dr. Leveck's report that would. Plaintiff refers to "the MRI, [X]-ray report, and reports of trigger points of fibromyalgia." However, as explained in the analyses above, the 2013 MRIs were no different than the MRI in 2008 when plaintiff was working full time, the spinal defects in the September 2013 X-rays were mild at most, and reports of "trigger points of fibromyalgia" were conclusory. Consequently, none of these support plaintiff's testimony.

### d. Conclusion

As shown above, the ALJ properly considered plaintiff's credibility. Accordingly, plaintiff's third claim of error is without merit.

### 4. Whether the ALJ Erred in Failing to Find Plaintiff Disabled Under Grid Rule 201.12 (Doc. 12, p. 16)

Plaintiff's final claim of error is quoted here in its entirety: "The Vocational Expert testified

that if [plaintiff] were limited to lifting five (5) pounds that she would not be able to perform work as per the Dictionary of Occupational Titles even at the sedentary level. Even if ten (10) pounds could be lifted and sedentary work could be performed, [plaintiff] would meet Grid Rule 201.12." (Doc. 12, p. 16)

The first part of plaintiff's argument pertains to the interplay between the 5 lb. lifting restriction and the Dictionary of Occupational Titles (DOT). Counsel is obligated to cross-examine the VE as to issues pertaining to his testimony and the DOT. *See e.g. Beinlich v. Comm'r of Soc. Sec.*, 345 Fed.Appx. 163, 168-69 (6th Cir. 2009)(citing *Ledford v. Astrue*, 311 Fed.Appx. 746, 757 (6th Cir. 2008)). As shown above at p. 9 she did not. Relief on judicial review will not lie in the absence of such cross-examination. *Beinlich*, 345 Fed.Appx. at 168-69 (citing *Ledford*, 311 Fed.Appx. at 757). As shown above at p. 9, counsel also did not cross-examine the VE about the applicability of Grid Rule 201.12. Again, failure to probe this matter waives the issue on judicial review. *See Kepke v. Comm'r of Soc. Sec.*, 636 Fed.Appx. 625, 636 (6th Cir. 2016)(citing *Sims v. Comm'r of Soc. Sec.*, 406 Fed.Appx. 977, 982 (6th Cir. 2011)). For the reasons explained above, plaintiff's fourth claim of error should be denied because it is waived.

## IV. CONCLUSION
## AND
## RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 16) be **DENIED** and the Commissioner's decision **AFFIRMED**. The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this

R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, 149, 155, *reh'g denied*, 474 U.S. 111 (1986); *see Berry v. Warden, Southern Ohio Correctional Facility*, 872 F.3d 329, 335 (6th Cir. 2017).

**ENTERED** this 27th day of June, 2018.

/s/ Joe B. Brown_____
Joe B. Brown
United States Magistrate Judge